NOT DESIGNATED FOR PUBLICATION

No. 113,784

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

ENTERPRISE BANK & TRUST,
*Appellee*,

v.

STEVEN VANLERBERG, *et al.*,
(GREGORY D. PRIEB and the GREGORY D. PRIEB REVOCABLE TRUST),
*Appellants.*

MEMORANDUM OPINION

Appeal from Johnson District Court; DAVID W. HAUBER, judge. Opinion filed June 10, 2016. Affirmed.

*Lawrence L. Ferree, III* and *Brett T. Runyon*, of Ferree, Bunn, Rundberg, Radom & Ridgway, Chartered, of Overland Park, for appellants Gregory D. Prieb and Gregory D. Prieb Revocable Trust.

*J. Loyd Gattis* and *W. Joseph Hatley*, of Spencer Fane LLP, of Kansas City, Missouri, for appellee.

Before HILL, P.J., McANANY and ARNOLD-BURGER, JJ.

*Per Curiam:* This case returns to this court after a prior panel issued an opinion on crediting the proceeds from a mortgage foreclosure sale. Gregory D. Prieb raises six district court errors that deal with: miscalculating the postjudgment interest rate and amount owed; failing to properly credit some payments; refusing to admit some emails and tax documents into evidence; and denying recovery for an expert's deposition fee. Our review of the record yields no reversible errors. We affirm.

1

*A brief history of this business endeavor provides a context for our holdings.*

In 2009, Prieb, Albert VanLerberg, and Roger Campbell formed Arbor Lake, LLC, to assume control of the property development of Prairie Star West, LLC. Arbor Lake made a commercial loan agreement with First National Bank of Olathe for $4,156,093.71. The promissory note provided for an interest rate of 4 percent in the first year, and a rate based on the Bank's prime rate thereafter. In the event of default, the promissory note stated that the annual interest rate would increase to 18 percent. The promissory note was secured by a mortgage.

Prieb, VanLerberg, and Campbell each gave personal guarantees for a "Share of the Indebtedness" of the loan to Arbor Lake. Specifically, Prieb and VanLerberg each guaranteed 25 percent of the loan and Campbell guaranteed 12.5 percent.

In 2011, the Bank sued the guarantors after Arbor Lake defaulted on its promissory note. During the litigation, the Bank entered receivership with the Federal Deposit Insurance Corporation. The FDIC assigned Arbor Lake's promissory note to Enterprise Bank & Trust.

In 2012, the district court rejected each of the guarantors' challenges to the guaranty agreements and entered total judgment against the guarantors in favor of Enterprise for $4,941,904.74, "at the rate of 18 percent per annum, calculated using a 360-day year, which is $2053.04 per day." The $4,941,904.74 reflected the unpaid principal of $4,106,086.99 plus the 18 percent daily accrued prejudgment interest of $2,053.04 on the unpaid principal.

The district court also ruled that Enterprise was entitled to $35,713.10 ($5879.30 + $29,833.80) in attorney fees for expenses incurred prior to judgment. The guarantors

2

appealed the district court's decision, arguing, *inter alia*, that the 18 percent default interest rate was unenforceable.

While the guarantors' appeal was pending, Arbor Lake confessed judgment to Enterprise. The district court ordered the mortgaged property sold. About six weeks later, Enterprise was the highest bidder at the sheriff's sale for $3,180,000. The district court subsequently confirmed the sheriff's sale, applied the after-tax proceeds of $3,061,120.51 to Arbor Lake's debt, and entered a deficiency judgment against Arbor Lake for the remaining amount.

Arbor Lake appealed the order confirming the sheriff's sale. The guarantors filed a separate appeal seeking to have the amount credited to Arbor Lake for the sale of the property applied to reduce their obligations under their respective guaranty agreements. Then, in 2013, this court affirmed the district court's March 2012 order in *Enterprise Bank & Trust v. VanLerberg*, No. 107,448, 2013 WL 1859202 (Kan. App. 2013) (unpublished opinion) (*Arbor Lake I*). In doing so, the panel rejected the guarantors' challenge to the enforceability of the 18 percent default interest rate in the promissory note, finding that the guarantors had contractually obligated themselves to pay this 18 percent interest by signing the guaranty agreements. 2013 WL 1859202, at *9-10.

Then, in 2014, another panel of this court considered Arbor Lake's appeal challenging the sheriff's sale (Case No. 12CV2606) and the guarantors' complaint that the district court should have applied the proceeds of the foreclosure sale to the judgments against them (Case No. 11CV1291). *Arbor Lake, LLC v. Enterprise Bank & Trust*, No. 109,757, 2014 WL 4723732 (Kan. App. 2014) (unpublished opinion) (*Arbor Lake II*). After confirming the sheriff's sale, this panel found that the district court erred by refusing to credit the proceeds from the foreclosure sale as partial satisfaction of the judgment against the guarantors or when determining each guarantor's liability based on the percentage of the loan guaranteed. 2014 WL 4723732, at *1, 9.

3

In finding the district court erred, the *Arbor Lake II* panel applied the merger doctrine, *i.e.,* the principle that a contract between parties is merged into a court order rendering any right of action under the contract unenforceable because the obligations imposed are by the order, not the contract. 2014 WL 4723732, at *7. The *Arbor Lake II* panel concluded that Enterprise was precluded under the merger doctrine from "using the terms of the guaranty agreements to modify or construe the judgment against the guarantors" because the guaranty agreements, which governed the prejudgment interest, merged into the judgment against the guarantors and ceased to exist, resulting in a postjudgment rate of interest controlled by statute. 2014 WL 4723732, at *8 (citing *Shields v. State Emp. Retirement System*, 363 Ill. App. 3d 999, 1009, 844 N.E.2d 438 [2006]). The *Arbor Lake II* panel explained,

> "What Enterprise Bank now has is a $4.9 million judgment against the guarantors subject to the judgment rule, requiring they be credited with money the bank has received in satisfaction of the economic loss the judgment remedies. . . . [T]hat includes the proceeds from the sale of the Arbor Lake property.
>
> "In addition, the judgment against the guarantors caps their liability to Enterprise Bank. That is, as the judgment reflects, each guarantor is liable for a percentage of that judgment corresponding to the percentage of the loan to Arbor Lake the guarantor agreed to repay. The judgment against the guarantors cuts off their liability for any interest accruing on the judgment against Arbor Lake and for any attorney fees Enterprise Bank incurred in efforts to enforce the judgment against Arbor Lake." 2014 WL 4723732, at *8.

On remand, Prieb and VanLerberg (Campbell settled) submitted revised proffers of satisfaction of judgment under Supreme Court Rule 186 (2015 Kan. Ct. R. Annot. 280) but primarily disagreed with Enterprise about what rate the postjudgment interest should be and how the district court should credit the proceeds from the Arbor Lake sale.

4

*The district court followed our mandate.*

In February 2015, after an evidentiary hearing on Enterprise's proffer, the district court issued an order resolving the parties' disputes. First, the district court rejected the guarantors' argument that it was required under K.S.A. 16-204 to apply a postjudgment interest rate of 4.75 percent. Instead, the district court found that K.S.A. 16-205 controlled the postjudgment interest rate given that the guarantors had contracted for an 18 percent interest rate upon default. The district court ordered that the guarantors' respective remaining share of indebtedness, *i.e.*, 25 percent each of the actual amount owed by Arbor Lake after the sale proceeds were applied, would accrue at 18 percent.

Second, the district court rejected each of the parties' proposed methods of how to credit the Arbor Lake proceeds to the guarantors' respective judgment amounts. The district court elected to calculate the amount owed by each guarantor on the date of the judgment (February 12, 2015) as follows:

> "(1) divide the judgment into each guarantor's respective 25% share as of the date the judgment was issued and maintain separate ledgers for each guarantor; (2) apply the payments made by each guarantor only as to their own portion, as of the date each payment is made; and (3) credit each guarantor with 25% of the Arbor Lake proceeds as of the date the proceeds were received by Enterprise."

Applying this method, the district court entered judgment against Prieb for $946,419.85 ($688,806.41 [principal] + $257,613.44 [interest]) with postjudgment interest of $344.40 accruing daily from February 12, 2015, based on 360-day year.

In determining the amount of the judgment, the district court first calculated Prieb owed 25 percent of the $4,941,904.74 judgment plus the $35,713.10 ($5879.30 + $29,833.80) in attorney fees Enterprise incurred prior to the 2012 judgment, or $1,244,404.46 (25 percent of $4,977,617.84). The district court found that the 18 percent

5

default interest accrued daily at $622.20223 until January 30, 2013, *i.e.*, when the Arbor Lake proceeds were applied in partial satisfaction. In reaching the $622.20 amount, the district court applied the 18 percent interest to the $1,244,404.46. Next, the district court credited Prieb $765,280.13 from the Arbor Lake proceeds (25 percent of $3,061,120.51) and deducted the $209,682.07 in interest that had accrued daily at $622.20 to that point. The district court subtracted this amount, $555,598.05 ($765,280.1275 - $209,682.074) from $1,244,404.46, calculating that the amount of the principal Prieb owed as of January 30, 2013, was $688,806.41.

In reaching the $344.40 amount, the district court applied the 18 percent postjudgment interest rate to the outstanding principal of $688,806.41. The district court then stated it was crediting Prieb with the $52,821.38 Enterprise had received for partial satisfaction of the judgment in May 2014 and added the accrued interest of $257,613.44 ($344.40 daily) to February 17, 2015, to reach the final calculation reflected in the judgment.

In March 2015, Enterprise advised that VanLerberg had satisfied the judgment. Prieb, however, filed a motion to reconsider.

Prieb argued:

(1) The district court erroneously charged "interest on interest as well as interest on attorney fees";

(2) the district court erroneously charged an 18 percent default interest rate instead of 4.75 percent;

(3) the district court failed to deduct any indirect credits from other guarantors paid in satisfaction of Arbor Lake's debt to the respective 25 percent judgment; and

6

(4) the district court erred in making evidentiary rulings excluding certain e-mails between the parties' counsel and an IRS Form 1099-A issued by Enterprise Bank to Arbor Lake.

Prieb also requested the district court grant postjudgment discovery to determine any loan history surrounding the Form 1099-A and whether the FDIC reimbursed Enterprise for attorney fees.

While the district court reviewed Prieb's motion to reconsider, Arbor Lake and Prieb filed a joint motion demanding, in part, either payment or credit towards Prieb's judgment for expert witness deposition fees taken in Case No. 12CV2606.

In April 2015, the district court denied Prieb's motion to reconsider. The next month, the district court denied Arbor Lake's and Prieb's motion demanding deposition fees in Case No. 12CV2606 as untimely. Prieb appeals from these decisions.

*We find no error in the court's calculation of the interest rate.*

Prieb argues that the district court failed to base its recalculation of the judgment on a reduced postjudgment default interest rate of 4.75 percent, the maximum rate authorized by statute. He contends that K.S.A. 16-204 controls the postjudgment default interest rate and, thus, he was only statutorily required to pay the 4.75 percent rate as published by the Kansas Secretary of State under K.S.A. 16-204(e)(1).

The district court ruled that K.S.A. 16-205(a) controlled the postjudgment default interest rate because Prieb had contracted for an 18 percent default rate in the guaranty agreement. The district court was correct.

7

Generally, the Kansas statute governing the interest rate on judgments provides that "[a]ny judgment rendered by a court of this state on or after July 1, 1986, shall bear interest on and after the day on which the judgment is rendered at the rate provided by subsection (e)." K.S.A. 16-204(d). And K.S.A. 16-204(e)(1) provides that the per annum statutory rate of interest on a judgment under the code of civil procedure "shall be . . . four percentage points above the discount rate."

We note two aspects of this law. First, K.S.A. 16-204 prefaces that it governs interest rates on judgments "[e]xcept as otherwise provided in accordance with law." The plain language of K.S.A. 16-204 indicates that other default interest rates—including higher interest rates—may supersede the statutory default provisions of K.S.A. 16-204. We will refrain from reading something into the statute when a statute is plain and unambiguous. See *Cady v. Schroll*, 298 Kan. 731, 738, 317 P.3d 90 (2014).

Second, K.S.A. 16-204(e)(1) does not say that the percent rate published by the Kansas Secretary of State is the maximum or mandatory interest rate authorized by law. Although K.S.A. 16-204(e)(1) states that "the rate of interest on judgments . . . *shall* be at a rate per annum" published by the Kansas Secretary of State, the Kansas Supreme Court has repeatedly interpreted the word "shall" to mean "may" within the context of certain statutes. See *Davis v. City of Leawood*, 257 Kan. 512, 519-21, 893 P.2d 233 (1995); *Bell v. City of Topeka*, 220 Kan. 405, 411-13, 553 P.2d 331 (1976); *Paul v. City of Manhattan*, 212 Kan. 381, 385, 511 P.2d 244 (1973). In other words, the statute's use of the word "shall" makes a particular provision mandatory or directory as the context of the statute requires. See *State v. Raschke*, 289 Kan. 911, 921, 219 P.3d 481 (2009). The *Raschke* court gave four factors to consider in determining whether the legislature's use of the word "shall" makes a particular provision directory or mandatory.

8

K.S.A. 16-204(e)(1) could also be read as a default provision that applies to judgments *except* (as clarified by the preface in K.S.A. 16-204) when another statute or regulation imposes an alternative interest rate.

The legislative history of K.S.A. 16-204 supports this interpretation—that K.S.A. 16-204 is a general provision. In *Schwartz v. Western Power & Gas Co., Inc.*, 208 Kan. 844, 850-51, 494 P.2d 1113 (1972), the Kansas Supreme Court's discussion of the legislative history of two previous enactments of K.S.A. 16-204 makes clear that the legislature did not intend for that statute to control judgment interest rates. In fact, the court found that the legislature's decision to remove the word "herein" from the pre-1971 version of K.S.A. 16-204 broadened the number of Kansas statutes that can supersede K.S.A. 16-204. *Schwartz,* 208 Kan. at 851.

Our Supreme Court's interpretation of K.S.A. 16-204 demonstrates the principle that a specific statute controls over a general statute. See *Sierra Club v. Moser*, 298 Kan. 22, 54, 310 P.3d 360 (2013). Therefore, K.S.A. 16-204 is a general, or default, statute providing the rate for postjudgment interest that must give way when a more specific interest rate statute applies.

A different statute governs here. The plain language of K.S.A. 16-205(a) states that when the parties specify a rate of interest in a contract, any judgment rendered on that contract shall apply the same interest in the contract so long as the contractual rate does not "exceed the maximum rate or amount authorized by law." K.S.A. 16-204(e)(1) does not establish a maximum statutory rate of postjudgment interest. Consequently, because the statutes are in conflict based on their plain language, we resort to statutory construction. See *Cady*, 298 Kan. at 739.

K.S.A. 16-205(a) applies "[w]hen a rate of interest or charges is specified in any contract" and a judgment is "rendered on any such contract." This subset of judgments is

9

more specific than *any* judgment the district court renders under the code of civil procedure. Therefore, K.S.A. 16-205(a) controls the interest rates of those judgments within its purview.

The public policy behind K.S.A. 16-205(a) also supports application of the interest rate controlled by that statute over the general postjudgment interest rates in K.S.A. 16-204. Generally, "Kansas courts allow the parties to choose the terms by which they will be bound under contract law." *TMG Life Ins. Co. v. Ashner*, 21 Kan. App. 2d 234, 253, 898 P.2d 1145 (1995). And parties who have fairly and voluntarily entered into such a contract are bound by their contract when the contract is neither illegal, contrary to public policy, or the result of fraud, mistake or duress. 21 Kan. App. 2d 234, Syl. ¶ 18. Having fairly negotiated those terms, it would be unfair for one party to escape its contractual obligations by defaulting on the contract. In *Wagnon v. Slawson Exploration Co.*, 255 Kan. 500, 509, 874 P.2d 659 (1994), the Kansas Supreme Court held that a post-default interest rate from 18 to 24 percent was valid under K.S.A. 16-205 because the "parties freely contract[ed] for a higher interest rate upon the occurrence of a default . . . and that higher interest rate [was] not otherwise illegal." In sum, K.S.A. 16-205(a) reflects "the legislature's recognition that a party is entitled to the bargained-for interest rate until paid in full." *Carnes v. Meadowbrook Executive Bldg. Corp.*, 17 Kan. App. 2d 292, 301, 836 P.2d 1212 (1992).

Finally, this court has recently stated that K.S.A. 16-205(a) supersedes the default interest rates enumerated in K.S.A. 16-204(e)(1). In *Master Finance Co. of Texas v. Pollard*, 47 Kan. App. 2d 820, 283 P.3d 817 (2012), this court analyzed a conflict of laws issue between a Kansas creditor who obtained a default judgment against a Missouri debtor. The district court in Kansas had attempted to alter the Missouri state court order that postjudgment interest would continue at the percentage rate provided in the parties' loan agreement by reducing that amount to the statutory rate provided for in K.S.A. 16-

204(e)(1). This court held that Kansas law required the debtor to pay the contractual interest rate:

> "[W]hen no postjudgment interest has been set forth in the contract or the judgment itself, the law of Kansas applies in determining what the postjudgment interest shall be. But Kansas law states that when a contract provides a specific interest rate, that interest rate continues 'until full payment is made, and any judgment rendered on any such contract shall bear the same rate of interest or charges mentioned in the contract, which rate shall be specified in the judgment.' K.S.A. 16-205(a). The 'parties can agree upon a different rate of interest from the postjudgment rate fixed by statute.' [Citation omitted.] Such an agreement existed here. Accordingly, because the Missouri judgment includes the applicable interest rate in the judgment itself, there is no conflict and the judgment as a whole, including the postjudgment interest rate, must be given full faith and credit." *Master Finance,* 47 Kan. App. 2d at 827.

Accordingly, given that the *Arbor Lake I* panel found the guarantors were contractually obligated to pay an 18 percent postjudgment default interest rate and K.S.A. 16-205(a) supersedes the statutory rate in K.S.A. 16-204(e)(1) in such instances, the district court did not err in finding that the amount Prieb owed from the date of default accrued at 18 percent.

*The district court did not err in following the mandate of this court.*

Prieb complains that the district court failed to comply with the mandate on remand by modifying the underlying March 2012 judgment (which calculated the postjudgment interest owed solely on the unpaid principal) by recalculating the postjudgment interest owed by the guarantors on the unpaid principal plus prejudgment interest and attorney fees. Alternatively, Prieb frames this issue as a question of whether the district court can unilaterally modify a judgment.

11

On remand from an appellate court, the district court can consider only "the matters essential to implementing the mandate." *Leffel v. City of Mission Hills*, 47 Kan. App. 2d 8, 15, 270 P.3d 1 (2011). This court's review of the district court's compliance with an appellate mandate is unlimited. But when we examine how a district court complied with the mandate, we treat it as a question of abuse of discretion. 47 Kan. App. 2d at 15-16.

The *Arbor Lake II* court remanded this case to the district court with three orders. The panel directed the court to recalculate the guarantors' outstanding obligations on the judgment against them in light of this court's ruling that the district court erred when it did not credit the net proceeds from the sheriff's sale of the Arbor Lake property as a partial satisfaction of the judgment against the guarantors. Also, the parties and the court were to address and resolve the application of the merger doctrine in determining the rate of postjudgment interest. And, the court was to determine the guarantors' liability for Enterprise Bank's attorney fees incurred after entry of the judgment. Since there are no further directions from the court, we view how the district court complied with the mandate as a matter of discretion.

In complying with our mandate, the district court ruled:

"The Court has chosen to calculate the judgment as follows:  (1) divide the judgment into each guarantor's respective 25% share as of the date the judgment was issued and maintain separate ledgers for each guarantor; (2) apply the payments made by each guarantor only as to their own portion, as of the date each payment is made; and (3) credit each guarantor with 25% of the Arbor Lake proceeds as of the date the proceeds were received by Enterprise."

Prieb argues this ruling somehow modifies the judgment of the court by calculating interest on the principal plus prejudgment interest, and on attorney fees. We

fail to see that as an error. To the contrary, this appears to be the district court's faithful obedience to the mandate in *Arbor Lake II*.

When the district court entered judgment against Prieb, interest began to accrue on all of Prieb's debts—not just the principal that Arbor Lake did not pay. After all, in *Iola State Bank v. Bolan,* 235 Kan. 175, 194, 679 P.2d 720 (1984), the Supreme Court ruled that prejudgment interest becomes a part of the judgment itself and postjudgment interest is computed on the entire amount of the judgment. That is what the district court did here.

The district court stated:

"The Court's original judgment calculated interest based on the entire unpaid balance of the note, which resulted in interest accruing at $2,053.04 per day. The Court's new computation ensures that each guarantor is liable only for interest accruing on 25% of the judgment, beginning at a rate of $622.202 per day. The Court believes that this is the error which the court of appeals instructed this Court to address, and it has now done so."

Attorney fees can be included in the judgment and bear interest at the rate to which the parties have stipulated. See *Sharp v. Barker*, 11 Kan. 381, 384 (1873). The guarantors' agreement calls for the payment of attorney fees and is binding on Prieb.

With respect to the final two sections of the mandate, we see that the district court considered but correctly refused to apply the doctrine of merger to the case. And, finally, the court assessed postjudgment attorney fees as the mandate directed.

*We address the issue of credits toward judgments.*

Prieb argues that the district court did not comply with the mandate because the district court refused to credit the judgment against him with (1) a portion of the payments the other guarantors made to Enterprise in satisfaction of their respective

13

judgments; and (2) payments Enterprise allegedly received from the FDIC for prejudgment attorney fees. We treat this as a matter of discretion.

Essentially, Prieb is arguing on appeal that his obligation under the guaranty agreement was not separate from the other guarantors' similar obligations and that a portion of any payment by one of those guarantors to satisfy their respective judgments should also apply towards Prieb's obligation. Prieb asserts that he only contracted to guarantee "up to" 25 percent of Arbor Lake's outstanding obligation to Enterprise "regardless of the source of any value received in satisfaction of that debt," less payments made directly by Prieb. We are unpersuaded.

After this court issued the mandate in *Arbor Lake II*, Prieb and VanLerberg proposed that the district court should, in addition to crediting them 100 percent for the payments made on their respective judgments, credit each of them "with a portion of the payments made by every other guarantor." Prieb sought a 25 percent "indirect credit" of the payments VanLerberg and Campbell paid to Enterprise in partial satisfaction and settlement of their respective judgments. Specifically, Prieb sought an indirect credit of $188,442.05 ($47,601 + $66,825 + $73,516.05 + $500) for payments VanLerberg paid, and another $83,288.63 from Campbell's settlement.

The district court disagreed, finding that Prieb and VanLerberg individually had to pay 25 percent of the remaining judgment after applying the Arbor Lake proceeds and they were not responsible for each other's share. The district court found that "[c]rediting each guarantor with payments of others would serve to over-credit each payment because the guarantors are no longer responsible for the same injury."

This court in *Arbor Lake II* simply assured that the guarantors were credited the value received by the proceeds from the foreclosure sale as partial satisfaction of the judgment against the guarantors. 2014 WL 4723732, at *5-9. In doing so, the panel

14

clearly explained that the effect of the partial satisfaction was that the guarantors would be required to pay less to satisfy the judgment but "would [still] remain liable for the unsatisfied portion of the judgment to the extent of the percentage for each set forth in the judgment." 2014 WL 4723732, at *5.

It is the law of this case that Prieb contracted to guarantee 25 percent of Arbor Lake's debt under the promissory note and that VanLerberg and Campbell similarly secured the debt by guaranteeing 25 percent and 12.5 percent respectively. Furthermore, the *Arbor Lake I* panel explicitly pointed out that the guarantors agreed that their individual respective shares of the indebtedness "will only be reduced by sums actually paid by Guarantor under this Guaranty, but will not be reduced by sums from any other source including, but not limited to . . . payments by anyone other than Guarantor." 2013 WL 1859202 at *7. Thus, each guarantor individually secured separate portions of the debt owed by Arbor Lake, not each other's debt. See *Leffel*, 47 Kan. App. 2d at 16.

Any suggestion by Prieb that "a credit on one must be reflected in the others" contradicts not only the law of the case but the terms Prieb fairly and voluntarily contracted how the guaranty agreement would be enforced against him upon default. A contract should be enforced according to its terms. *Hall v. Shelter Mutual Ins. Co.*, 45 Kan. App. 2d 797, 800-01, 253 P.3d 377 (2011), *rev. denied* 293 Kan. 1106 (2012).

Moreover, if the district court had interpreted the individual guaranty agreements as permitting a payment of one guarantor to reduce the liability of that guarantor and the other two guarantors, Enterprise would have been prevented from recovering the full amount of Arbor Lake's debt the guarantors contracted to pay in the event of default. As the *Arbor Lake I* panel noted in discussing whether Arbor Lake's rights would be impaired by Enterprise seeking satisfaction of the debt under the personal guaranties, "assuming personal judgments for the lender, and satisfaction of those judgments, Arbor

15

Lake's indebtedness under the note would be reduced by *62.5 percent*." (Emphasis added.) 2013 WL 1859202 at *5.

Taking into account Campbell settled his 12.5 percent obligation, Prieb and VanLerberg were still obligated to pay 25 percent each of the remaining 50 percent of Arbor Lake's debt after the district court applied the judgment from the foreclosure sale. If a payment by one guarantor also served to reduce the liability of the other by 25 percent of that same payment, as Prieb and VanLerberg proffered, the net effect would clearly result in Enterprise not recovering the entire remaining 50 percent of the debt owed.

It is clear that the district court complied with the mandate by ensuring that each guarantor was liable for the unsatisfied portion of the judgment to the extent of the full percentage to which each guarantor agreed. The district court did not abuse its discretion in refusing to credit the judgment against Prieb for payments by the other guarantors.

*We address Prieb's claim that Enterprise is double-dipping on attorney fees.*

In a Shared Loss Agreement, the FDIC allegedly paid some attorney fees to Enterprise. Prieb claims, without any proof, that he is being charged for some, if not all, of the same fees. His chief complaint is that the district court would not grant him further discovery on the issue. Some case history provides a proper context for this question.

At the January 30, 2015, evidentiary hearing on Enterprise's proffer, Prieb asked Duncan Burdette, the regional chairman for Enterprise, whether Enterprise had "sought reimbursement" of attorney fees "in the Arbor Lake case," Case No. 12CV2606. Burdette responded, "Some attorney fees." When asked if Enterprise was going to be reimbursed in Case No. 11CV1291 by the FDIC for postjudgment attorney fees, the district court sustained Enterprise's objection for lack of relevance, ruling that our court's mandate

16

specified that the guarantors would not pay any postjudgment attorney fees. The postjudgment attorney fees were locked in with the underlying judgment. Prieb then attempted to ascertain whether the FDIC had reimbursed Enterprise any prejudgment attorney fees. The district court sustained Enterprise's relevancy objection, ruling that "the judgment was confessed," and if Prieb wanted to determine whether attorney fees were included in Arbor Lake's judgment Prieb "should have done it before [Arbor Lake] confessed judgment." In subsequently denying Prieb's motion for reconsideration, the district court ruled, "As judgment has been entered, discovery is no longer ongoing."

Other than just asserting that additional postjudgment discovery is needed to support his claim, Prieb fails to challenge the district court's underlying ruling or its legal basis sustaining Enterprise's objections. Prieb makes no effort to explain any legal basis why he should be credited for any alleged prejudgment reimbursement of attorney fees in Case No. 12CV2606. A point raised incidentally in a brief and not argued therein is also deemed abandoned. *Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 645, 294 P.3d 287 (2013).

Moreover, Prieb's sole reliance on a simple citation to *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013)—which concerned a district court's refusal to permit additional discovery before ruling on a summary judgment motion—does nothing to advance Prieb's conclusory complaints regarding postjudgment discovery. Failure to support a point with pertinent authority or show why it is sound despite a lack of supporting authority or in the face of contrary authority is akin to failing to brief the issue. *State v. Tague*, 296 Kan. 993, 1001, 298 P.3d 273 (2013).

Finally, any concern that Enterprise did not fully disclose the true amount due in Case No. 12CV2606 because Enterprise was allegedly reimbursed attorney fees after judgment was entered concerns Arbor Lake, not Prieb. This court's jurisdiction only

17

extends to questions arising from the case that gave rise to the appeal, which is Case No. 11CV1291. See *Morris v. Francisco*, 238 Kan. 71, 74, 708 P.2d 498 (1985) (finding that the court lacked jurisdiction because "[d]efendant is attempting to appeal an order entered in one case through the vehicle of an appeal in another case").

*The court did not err when it refused to admit some settlement emails.*

This issue concerns the admissibility of emails from 2013 sent between Enterprise's and Prieb's attorneys that Prieb offered into evidence to challenge Enterprise's Rule 186 proffer. Before clarifying the standard of review and to place Prieb's argument in context, a summary of the emails in question and the district court's rulings is necessary.

*Prieb attempts to offer settlement emails into evidence.*

On April 15, 2013, Prieb's attorney asked Enterprise's attorney to prepare a payoff statement for Prieb's debt. Fifteen days later, Prieb's attorney made the same request of Enterprise's attorney. Enterprise's attorney expressed doubt about providing that information given the appeal of the confirmation order. Prieb's attorney responded that the guarantors wanted to know what Enterprise "claims is owed to assist in evaluating their respective positions."

Enterprise's attorney replied by sending a message labeled, "CONFIDENTIAL - FOR SETTLEMENT PURPOSES ONLY." Enterprise's attorney explained that he understood "evaluating respective positions" to mean that Prieb wanted "to evaluate the merit in resolving the litigation." Then, referring to "the settlement offer we got," Enterprise's attorney provided an estimate of the guarantors' debt for the purpose of helping them "evaluate the merit in resolving this litigation."

18

Before doing so, Enterprise's attorney clarified that the provided estimate was "not an official representation of the bank's position regarding any pay-off." Enterprise's attorney then estimated Prieb owed $1,466,646 and explained that this estimate represented "approximately $170,000" less than the amount Prieb would owe not including legal fees if another year passed before payment of the judgment because Prieb pursued another appeal. The message concluded with the suggestion that if Prieb wanted to "get serious about resolving the matter" Enterprise's attorney would encourage his clients to "have some settlement discussions."

Prieb's attorney responded that it would "help the process" if his clients received more information regarding "how the proceeds of the foreclosure sale were applied." Prieb's attorney also declared, "In regard to settlement my clients are interested in pursuing resolution." Enterprise's counsel provided more information about how the credit for the foreclosure sale was applied to the judgment against Arbor Lake but clarified that "no credit for the foreclosure sale was applied to the judgments against the guarantors."

At the January 30, 2015, evidentiary hearing on Enterprise's proffer, Prieb questioned Burdette about the emails between the parties' attorneys. Enterprise objected on the ground that the emails were inadmissible because one was marked "CONFIDENTIAL - FOR SETTLEMENT PURPOSES ONLY."

Prieb responded by arguing that there was no exchange of any compromised number so the emails did not qualify as a settlement negotiation. The district court asked Prieb why the emails would not be part of settlement discussions given that Prieb's attorney had responded to the email entitled, "CONFIDENTIAL - FOR SETTLEMENT PURPOSES ONLY" by stating that his clients were interested in pursuing resolution regarding settlement. Prieb conceded the correspondence "may be preliminary settlement discussions" but stood on his argument that no numbers of compromise were proposed.

19

The district court sustained the objection, ruling that the emails were "clearly part of settlement discussions." And when Prieb afterward offered the emails into evidence, the district court reiterated that the emails were "settlement negotiations and communications" that were inadmissible under "public policy."

In denying Prieb's motion for reconsideration of the admission of the emails, the district court gave two additional reasons:

(1) the e-mails merely reflected "the parties' legal conclusions" as to the amount the guarantors owed being more than what Arbor Lake owed and were not relevant; and

(2) Prieb's attempt to introduce the correspondence constituted an improper effort to collaterally attack the judgment.

Prieb raises three arguments on this point. He contends the district court erred in finding the emails were settlement discussions, were irrelevant, and constituted a collateral attack on the judgment against him.

In Kansas, offers of settlement and pretrial settlement negotiations are generally inadmissible. *Ettus v. Orkin Exterminating Co*., 233 Kan. 555, Syl. ¶ 9, 665 P.2d 730 (1983). This rule is codified in K.S.A. 60-453:

> "Evidence that a person has accepted or offered or promised to accept a sum of money or any other thing, act or service in satisfaction of a claim, is inadmissible to prove the invalidity of the claim or any part of it."

K.S.A. 60-453 protects the value of a plaintiff's claim during settlement negotiations and advances the public policy behind the statute—to promote settlement

20

without fear the settlement will be used as evidence against the settling parties. *Lytle v. Stearns*, 250 Kan. 783, 791, 830 P.2d 1197 (1992).

Prieb argues that K.S.A. 60-453 does not apply because (1) no settlement discussion took place in the emails; and (2) Prieb did not offer the emails into evidence to attack the validity of Enterprise's claim but, instead, to "attack how the *judgment* based on the guaranties has been accounted."

Prieb's first argument stands in direct contrast to his concession at the evidentiary hearing that the emails "may be preliminary settlement discussions." Moreover, in the email entitled, "CONFIDENTIAL - FOR SETTLEMENT PURPOSES ONLY," Enterprise's attorney repeatedly referenced the term *settlement* and the need to *resolve* the litigation, conveyed an estimate of an amount to resolve that dispute, and provided an explanation why resolving the litigation was in Prieb's best interest. Prieb's attorney responded to this email by relaying that he had consulted with his client and Prieb was interested in resolving the litigation or a settlement pending further clarification of the proceeds from the foreclosure sale. The emails clearly indicate the onset of settlement negotiations, and Prieb does not contend that there was a signed agreement between the parties. "Absent express final agreement by the parties, any negotiations must be considered preliminary and as such they are inadmissible." *Draskowich v. City of Kansas City*, 242 Kan. 734, 737, 750 P.2d 411 (1988); see *Ettus*, 233 Kan. 555, Syl. ¶ 9.

The record also contradicts Prieb's assertion regarding the purpose of offering the emails into evidence. In asking the district court to reconsider its ruling, Prieb specifically argued the emails were necessary to demonstrate an "extreme disparity" in Enterprise's position as to what the guarantors owed and Arbor Lake owed.

In other words, Prieb offered the emails in an attempt to invalidate Enterprise's claim regarding the amount Prieb actually owed as a guarantor. Any amount suggested by

21

Enterprise's attorney in the April 2013 email ($1,466,646) occurred prior to *Arbor Lake II*'s decision of which proceeds from the foreclosure sale acted as partial satisfaction of the judgment against Prieb. The policy behind the statute—to promote settlement—supports the district court's decision to reject the admission of the emails. See *Lytle*, 250 Kan. at 791.

We find no error here.

*Refusing to admit some tax documents into evidence was not erroneous.*

Prieb argues that the district court abused its discretion by improperly sustaining Enterprise's lack of sufficient foundation objection to the admission of Arbor Lake's 1099-A form for the tax year 2013 offered into evidence. This is a matter of district court discretion.

At the evidentiary hearing on Enterprise's proffer, Burdette testified that a form shown to him "appear[ed] to be a Form 1099-A for the tax year 2013 for Arbor Lake" prepared by Enterprise. When Burdette was asked to describe the outstanding principal on the Arbor Lake loan reflected at the end of the 2013 tax year, Enterprise objected due to lack of sufficient foundation and relevancy. The district court expressed concern regarding the relevancy of the document as the judgment against Arbor Lake had been affirmed on appeal and the mandate from *Arbor Lake II* was the only issue before the district court. Prieb proffered that Arbor Lake's 2013 Form 1099-A would affect the amount owed on remand and sought permission to ask Burdette about "some of the specific numbers in the document." The district court allowed the questioning but noted that it did not find Arbor Lake's 2013 Form 1099-A relevant.

When questioned, Burdette first acknowledged that Box 4 on Arbor Lake's 2013 Form 1099-A reflected a "fair market value" of $3,180,000 for the Arbor Lake property.

Prieb then asked Burdette whether Box 2 on the form showed the "principal outstanding" of $3,836,000 "apparently, after the credit of $3.1 million." Burdette responded, "I don't believe your interpretation is correct, but I'm not an accountant or a tax expert." Prieb again tried to get Burdette to agree with his math in deducing whether Arbor Lake's 2013 Form 1099-A reflected the "principal balance" of Arbor Lake's debt, and Burdette responded, "I don't know. I said I'm not a tax accountant; I'm not in the tax department of the Bank."

Afterward, when Prieb offered Arbor Lake's 2013 Form 1099-A into evidence, Enterprise objected that Prieb had not established relevance or a foundation given that Burdette testified he did not have sufficient knowledge about Arbor Lake's 2013 Form 1099-A to testify about it. The district court sustained the objection, finding "it's clear to me [Burdette] was struggling to explain . . . you obviously showed him the boxes; you were, in essence, testifying for him what the result means. I'm not convinced that this witness has sufficient foundation to even testify what [Arbor Lake's 2013 Form 1099-A] actually means."

The district court, in denying Prieb's motion for reconsideration on the issue of the admissibly of Arbor Lake's 2013 Form 1099-A, subsequently affirmed its prior ruling excluding the evidence. The district court ruled that because judgment against Arbor Lake had been entered and discovery was closed Prieb was attempting to collaterally attack the guarantors' judgment without the requisite showing under K.S.A. 60-260(b). The district court found that Prieb had not presented sufficient evidence that Arbor Lake's 2013 Form 1099-A constituted fraud or demonstrated why the form could not have been produced earlier.

The record indicates that the district court excluded the evidence for a lack of foundation and noted that the evidence was not relevant. Prieb does not explain or give any argument why satisfying the requirements of a hearsay exception cures his failure to

23

lay an adequate foundation for the evidence. A point raised incidentally in a brief and not argued therein is deemed abandoned. *Friedman*, 296 Kan. at 645.

And even assuming arguendo that Arbor Lake's 2013 Form 1099-A was made in the regular course of business and properly authenticated, a party alleging that a document is a business record must lay a proper foundation to bring the hearsay evidence within the business records exception by presenting testimony from someone who is "'qualified by knowledge of the facts.'" *State v. Brown*, 15 Kan. App. 2d 465, 468, 809 P.2d 559, *rev. denied* 248 Kan. 997 (1991) (quoting *State v. Cremer*, 234 Kan. 594, 601, 676 P.2d 59 [1984]).

In *Brown*, this court addressed what constitutes a trustworthy witness with sufficient knowledge of the facts to lay a proper foundation to admit a business record. This court found that the witness testimony used to introduce computer bank records containing inquiries a teller made regarding an account to commit fraud was sufficient to lay a proper foundation despite the witness being unfamiliar with the intricacies of the computer's operations because the witness was "able, through his training, to interpret the numbers on the inquiry information to determine from what terminal and cashbox the requests came." 15 Kan. App. 2d at 468.

Here, Burdette testified that he did not have the necessary knowledge about the meaning of Arbor Lake's 2013 Form 1099-A or the numbers at issue on the form and that he was not qualified to interpret tax documents. There was no testimony about any foundation facts on how Arbor Lake's 2013 Form 1099-A was created. The record shows Burdette's function was limited to managing Enterprise's assets and loans; he was totally unqualified or lacked the training to provide the necessary foundation interpreting the accuracy, meaning, and trustworthiness of Arbor Lake's 2013 Form 1099-A. Contrary to Prieb's assertion, simply being able to identify a tax document does not translate to

24

having sufficient specific knowledge of the facts contained therein to lay a foundation for the admission of the document as a business record.

Burdette was not the proper foundation witness. Based on the record, there was a sufficient basis from which a rational factfinder could determine that Burdette did not have sufficient knowledge about Arbor Lake's 2013 Form 1099-A to testify about it. This holds true under both a business record statutory hearsay exception analysis and in evaluating the district court's considerable discretion in making general evidentiary rulings regarding foundation evidence. See *Wiles v. American Family Assurance Co.*, 302 Kan. 66, 73, 350 P.3d 1071 (2015). Accordingly, sufficient evidence supports the district court's discretion in excluding Arbor Lake's 2013 Form 1099-A and we will not disturb the district court's ruling on this point.

*Witness fees arising in another case cannot be awarded to Prieb in this case.*

Prieb claims that the district court abused its discretion in denying his postjudgment motion seeking fees for an expert witness deposition taken in Case No. 12CV2606 as untimely.

In December 2012, Enterprise deposed Arbor Lake's expert appraiser, Kevin O'Bryan, in Case No. 12CV2606. The fees amounted to $2,300. Arbor Lake subsequently confessed judgment to Enterprise and this court ultimately affirmed the district court's confirmation of the foreclosure sale in Case No. 12CV2606. *Arbor Lake II*, 2014 WL 4723732, at *4.

It is undisputed that O'Bryan's deposition took place in a different action involving Arbor Lake—Case No. 12CV2606—and that Prieb's appeal arose from Case No. 11CV1291. Arbor Lake was not precluded from attempting to seek payment for the $2,300 deposition fees to reduce the final judgment in Case No. 12CV2606. In fact, the

motion seeking payment for O'Bryan's deposition reflected that both parties—Arbor Lake and Prieb—filed a combined motion citing to their respective case numbers. However, only Prieb appealed the denial of that motion, not Arbor Lake.

Consequently, Prieb is using this appeal as a collateral vehicle to attempt to modify the final judgment against Arbor Lake in Case No. 12CV2606, which is unrelated to the case before us on appeal. In fact, Prieb, in advancing another issue on appeal acknowledges, "the foreclosure case (12CV2606) . . . was never consolidated and was considered a totally separate case with no common questions of law or fact." This court lacks jurisdiction to consider issues challenging the judgment in a case that does not give rise to the appeal. See *Morris*, 238 Kan. at 74.

Affirmed.